**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

| | |
|---|---|
| **TERRI FINK**, individually and on behalf of all others similarly situated;<br><br>*Plaintiff*,<br><br>v.<br><br>**3C CARE SYSTEMS LLC**, **MIDWEST SPINE & BRAIN INSTITUTE, LLC**,<br><br>*Defendants*. | Case No.: 0:26-cv-03767<br><br>**COMPLAINT-CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

**PLAINTIFF'S CLASS ACTION COMPLAINT**

Plaintiff Terri Fink ("Plaintiff"), individually and on behalf of all others similarly situated, sues 3c Care Systems LLC ("3c Care") and Midwest Spine & Brain Institute, LLC ("MSBI") (collectively, "Defendants"), to obtain damages, restitution, and injunctive relief for the Class, as defined below, from Defendants. For her Class Action Complaint and Jury Demand, Plaintiff makes the following allegations upon information and belief, except as to her own actions, the investigation of her counsel, and the facts that are a matter of public record.

## I. INTRODUCTION

1. This class action arises out of a data security incident affecting the computer network of 3c Care, a vendor that creates, receives, maintains, or transmits protected health information on behalf of numerous healthcare-industry clients, including MSBI (the "Data Breach"). MSBI used 3c Care's systems to store and process certain personally identifiable

information ("PII") and protected health information ("PHI") (collectively, the "Private Information") of Plaintiff and other current and former patients of MSBI, the putative class members ("Class").

2. On August 14, 2026, MSBI mailed Plaintiff a notice of the Data Breach which states that 3c Care's network had been accessed by an unknown actor on or about November 21, 2024.[1] The notice advises patients that the Private Information compromised in the Data Breach included certain personal or protected health information of MSBI's patients. This Private Information may have included patient her full name, date of birth, Social Security number, medical record number, treatment location, procedure type, provider name, treatment cost, medical date of service, patient account number, diagnosis, diagnosis code, and treatment information.[2]

3. The Data Breach resulted from 3c Care's failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect the Private Information entrusted to its systems, and from MSBI's failure to exercise reasonable care in selecting, overseeing, and ensuring the security of the third-party vendor to which it entrusted its patients' Private Information.

4. Plaintiff brings this class action lawsuit on behalf of those similarly situated to address Defendants' inadequate safeguarding of Class Members' Private Information that they collected and maintained, and for failing to provide timely and adequate notice to

---

[1] Notice of Data Breach Letter from Midwest Spine & Brain Institute, LLC to Terri Fink (Aug. 14, 2026), attached hereto as **Exhibit A**.

[2] *Id.*

Plaintiff and other Class Members that their information was subjected to unauthorized access by an unknown third party and precisely what specific type of information was accessed.

5. Defendants maintained and controlled the Private Information in a reckless manner. In particular, 3c Care maintained the Private Information on a computer network vulnerable to cyberattacks, while MSBI entrusted that Private Information to 3c Care without ensuring that 3c Care employed reasonable safeguards. Upon information and belief, the mechanism of the Data Breach and potential for improper disclosure of Plaintiff's and Class Members' Private Information was a known risk to Defendants, and thus Defendants were on notice that failing to take steps necessary to secure the Private Information from those risks left that property in a dangerous condition.

6. Defendants, through their respective employees, disregarded the rights of Plaintiff and Class Members (defined below) by, among other things, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures within their respective control to ensure their data systems were protected against unauthorized intrusions. Defendants also failed to disclose that they did not have adequately robust computer systems and security practices to safeguard Plaintiff's and Class Members' Private Information and failed to take standard and reasonably available steps to prevent the Data Breach.

7. In addition, 3c Care's employees failed to properly monitor the computer network and systems that housed the Private Information. Had 3c Care's employees

(presumably in the IT department) properly monitored its systems, 3c Care would have discovered the intrusion sooner.

8. Plaintiff's and Class Members' identities are now at risk because of Defendants' negligent conduct since the Private Information that Defendants collected and maintained is now in the hands of data thieves.

9. Armed with the Private Information accessed in the Data Breach, data thieves can commit a variety of crimes. These crimes include opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' information to obtain government benefits, filing false medical claims using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

10. Because of the Data Breach, Plaintiff and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiff and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft.

11. Plaintiff and Class Members may also incur out of pocket costs for, *e.g.*, purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

12. Through this Complaint, Plaintiff seeks to remedy these harms on behalf of herself and all similarly situated individuals whose Private Information was accessed during the Data Breach.

13. Plaintiff seeks remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief including improvements to Defendants' data security systems, future annual audits, and adequate credit monitoring services funded by Defendants.

14. Accordingly, Plaintiff brings this action against Defendants seeking redress for their unlawful conduct, and asserting claims for: (i) negligence against both Defendants; (ii) breach of implied contract against MSBI; and (iii) unjust enrichment against both Defendants.

## II. PARTIES

15. Plaintiff Terri Fink is and at all times mentioned herein was an individual citizen of Minnesota, residing in the city of Edina.

16. Plaintiff provided MSBI with her sensitive PII and PHI to receive healthcare services from MSBI. MSBI, in turn, caused or permitted that information to be processed or maintained on 3c Care's systems.

17. Defendants 3c Care Systems LLC is a Minnesota limited liability company with its principal place of business in Minneapolis, Minnesota. 3c Care's registered agent for service of process is United States Corporation Agents, Inc., 500 E. Grant St., Apt. 1202, Minneapolis, MN 55404-1458.

18. Defendants Midwest Spine & Brain Institute, LLC is a Delaware limited liability company with its principal place of business in Stillwater, Minnesota. MSBI's registered agent for service of process is Glenn Buttermann, 1950 Northwestern Ave S, Ste. 102, Stillwater, MN 55082-7615.

## III. JURISDICTION AND VENUE

19. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2), the Class Action Fairness Act of 2005 ("CAFA"), because this is a class action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the Class, and at least one member of the Class is a citizen of a State different from at least one Defendant.

20. This Court has personal jurisdiction over Defendants because each Defendant regularly conducts and solicits business in this District and throughout the United States, has purposefully availed itself of the privileges of conducting business activities within this District, and the wrongful conduct giving rise to this action occurred in substantial part within this District.

21. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because at least one Defendant resides in this District, a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District, and Defendants have caused harm to Plaintiff and Class Members residing in this District.

## IV. FACTUAL ALLEGATIONS

### *A. Defendants' Businesses*

22. 3c Care is a Minnesota limited liability company and self-described "boutique Healthcare IT company specializing in workflow automation and augmentation solutions" for the healthcare industry. 3c Care markets itself as serving approximately 35 direct clients—including hospitals, imaging centers, specialty clinics, and telemedicine providers—across sixteen states, and separately provides cloud-hosting services to clinics,

original equipment manufacturers, and health information system vendors, including Defendant MSBI.[3]

23. MSBI is a Delaware limited liability company that has operated since 1987 as a Minnesota-based orthopedic spine and neurosurgery practice, providing surgical and non-surgical care for spinal disorders, brain conditions, and other neurological conditions to patients throughout Minnesota and Wisconsin.[4]

24. MSBI uses third-party vendors, including 3c Care, to process or maintain portions of its patients' Private Information on its behalf.

25. Plaintiff and Class Members are current and former patients (collectively "patients") of MSBI.

26. As a condition of receiving healthcare services, MSBI required that its patients, including Plaintiff and the Class Members, provide MSBI with their Private Information, including at least the following: her full name, date of birth, Social Security number, medical record number, treatment location, procedure type, provider name, treatment cost, medical date of service, patient account number, diagnosis, diagnosis code, and treatment information.

27. MSBI caused or permitted this Private Information to be stored and processed on 3c Care's information technology computer systems and servers, on information and belief located at 3c Care's headquarters in Minneapolis, Minnesota.

---

[3] *See* About Us, 3c Care Systems, LLC, https://3ccaresystems.com/about-us/ (last visited Aug. 24, 2026).

[4] *See* Midwest Spine & Brain Institute, https://midwestspine.net (last visited Aug. 24, 2026).

28. On information and belief, the information held by 3c Care in its computer systems at the time of the Data Breach included the unencrypted Private Information of Plaintiff and Class Members.

29. Upon information and belief, in the course of collecting Private Information from patients, including Plaintiff, MSBI promised to provide confidentiality and adequate security for the data it collected from them through its applicable privacy policy and through other disclosures in compliance with statutory privacy requirements and industry standards, and MSBI further promised that any third-party vendor to which it entrusted that data, including 3c Care, would be held to the same standard

30. Plaintiff and the Class Members, as patients of MSBI, relied on these promises and on this sophisticated business entity to keep their sensitive Private Information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information. Patients, in general, demand security to safeguard their Private Information, especially when their Social Security numbers, PHI, and other sensitive Private Information is involved.

31. Plaintiff and the Class Members have taken reasonable steps to maintain the confidentiality of their Private Information and would not have entrusted it to MSBI absent a promise to safeguard that information.

32. Plaintiff and the Class Members provided their Private Information to MSBI with the reasonable expectation and on the mutual understanding that MSBI would comply with its obligations to keep such Private Information confidential and secure from unauthorized access, and that MSBI would ensure that 3c Care, as the vendor it selected,

did the same.

33. Each Defendant had a duty, within its respective role, to adopt reasonable measures to protect the Private Information of Plaintiff and Class Members from involuntary disclosure to third parties. Each Defendant has a legal duty to keep Plaintiff's and Class Members' Private Information safe and confidential.

34. Defendants had obligations created by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTCA"), industry standards, and representations made to Plaintiff and Class Members, to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

35. By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendants assumed legal and equitable duties and knew or should have known it was responsible for protecting Plaintiff's and Class Members' Private Information from disclosure.

### *B. The Data Breach*

36. A Data Breach occurs when cyber criminals intend to access and steal Private Information that has not been adequately secured by a business entity like Defendants.

37. Plaintiff and the proposed Class Members provided their Private Information to MSBI as a condition of receiving healthcare services. MSBI caused or permitted that Private Information to be stored on 3c Care's computer systems and servers.

38. Unfortunately, Defendants failed to take adequate measures within their respective control to protect Plaintiff's and the Class Members' Private Information stored on 3c Care's computer servers. 3c Care failed to implement reasonable cybersecurity

safeguards or policies to protect Private Information, and failed to supervise its information technology or data security agents and employees to prevent, detect, and stop breaches of its systems. MSBI failed to exercise reasonable care in selecting, monitoring, and overseeing 3c Care as its third-party vendor.

39. As a direct result of Defendants' failures, MSBI posted a notice on its website stating that its third-party vendor, 3c Care, had been affected by an external cyberattack that resulted in unauthorized access to the systems 3c Care used to store and process MSBI's patient data.[5] In the Notice Letter MSBI mailed to Plaintiff and the Class on or about August 14, 2026, MSBI confirmed that the cybercriminals had access to the Private Information of Plaintiff and the Class Members from on or about November 21, 2024.[6] The information accessed included at least her full name, date of birth, Social Security number, medical record number, treatment location, procedure type, provider name, treatment cost, medical date of service, patient account number, diagnosis, diagnosis code, and treatment information, and other highly sensitive data.[7]

40. Omitted from the notice were the identity of the cybercriminals who perpetrated this Data Breach, the details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again. To date, these omitted details have not been explained or clarified to Plaintiff and

---

[5] *See* Notice of Data Security Incident, Midwest Spine & Brain Institute, LLC, https://midwestspine.net/wp-content/uploads/2025/01/Notice-of-Data-Security-Incident.pdf (last visited Aug. 24, 2026).
[6] *See* Notice, attached hereto as **Exhibit A**.
[7] *Id.*

Class Members, who retain a vested interest in ensuring that their Private Information remains protected.

41. This "disclosure" amounts to no real disclosure at all, as it fails to inform, with any degree of specificity, Plaintiffs and Class Members of the Data Breach's critical facts. Without these details, Plaintiff's and Class Members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

42. Despite Defendants' intentional opacity about the root cause of this incident, several facts may be gleaned from the Notice Letter, including: a) that this Data Breach was the work of cybercriminals; b) that the cybercriminals first infiltrated 3c Care's networks and systems, and downloaded data from the networks and systems (aka exfiltrated data, or in layperson's terms "stole" data); and c) that once inside 3c Care's networks and systems, the cybercriminals targeted information including Plaintiff's and Class Members' Social Security numbers, PHI, and other sensitive information for download and theft.

43. In the context of notice of data breach letters of this type, Defendants' characterization of the incident as an unauthorized actor having merely "gained access" to the network environment is misleading lawyer language that understates what occurred. Companies only send notice letters because data breach notification laws require them to do so. And such letters are only sent to those persons who a Defendant itself has a reasonable belief that such personal information was accessed or acquired by an unauthorized individual or entity. Defendants cannot hide behind legalese—by sending a notice of data breach letter to Plaintiff and Class Members, MSBI admits that it has a

reasonable belief that Plaintiff's and Class Members' names, Social Security numbers, PHI, and other sensitive information was accessed or acquired by an unknown actor—aka cybercriminals.

44. In its Notice Letter, MSBI failed to specify whether it, or 3c Care, undertook any efforts to contact Class Members whose data was accessed and acquired in the Data Breach to inquire whether any of the Class Members suffered misuse of their data, whether Class Members should report their misuse to Defendants, and whether either Defendant set up any mechanism for Class Members to report any misuse of their data.

45. Based on the nature of the cyberattack, Plaintiff's and the members of the proposed Class Members' Private Information, unauthorizedly disclosed to third-party cybercriminals in the Data Breach, is currently available on the dark web for public viewing and use, in the public domain, to be sold and utilized for fraudulent and criminal misuse.

46. As a result of the Data Breach, its victims face a lifetime risk of identity theft, as it includes sensitive information that cannot be changed, like their Social Security numbers. Accordingly, the credit monitoring and identity theft protection which MSBI offered in the Notice of Data Breach are wholly insufficient to compensate Plaintiff and the Class Members for their damages resulting from the Data Breach.

47. MSBI's offer to supply Plaintiff and the Class Members with credit monitoring services supports the reasonable belief that, Plaintiff's and the Class Members' PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

48. As a result of the Data Breach which Defendants permitted to occur by virtue of their inadequate data security practices, Plaintiff and the proposed Class Members have suffered injury and damages, as set forth herein.

49. The U.S. Department of Health and Human Services requires, "[i]f a breach of unsecured protected health information affects *500 or more individuals*, a covered entity must notify the Secretary of the breach without unreasonable delay and in *no case later than 60 calendar days* from the discovery of the breach."[8] Further, if "the number of individuals affected by a breach is uncertain at the time of submission, the covered entity should provide an estimate," and later provide an addendum or correction to HHS.[9]

50. Defendants had obligations created by HIPAA, contract, industry standards, common law, and representations made to Class Members, to keep Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

### *C. Data Breaches Are Preventable*

51. Defendants did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, causing the exposure of Private Information, such as encrypting the information or deleting it when it is no longer needed.

[8] U.S. Department of Health and Human Services, *Submitting Notice of a Breach to the Secretary* (Feb. 27, 2023) https://www.hhs.gov/hipaa/for-professionals/breach-notification/breach-reporting/index.html (last viewed February 11, 2026) (emphasis added).

[9] *Id.*

52. Defendants could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting their equipment and computer files containing Private Information.

53. As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[10]

54. To prevent and detect cyber-attacks and/or ransomware attacks, Defendants could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege:

[10] How to Protect Your Networks from RANSOMWARE, at 3, *available at:* https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view

no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.
- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[11]

55. To prevent and detect cyber-attacks or ransomware attacks, Defendants could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure Internet-Facing Assets**

- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;

[11] *Id.* at 3-4.

**Thoroughly investigate and remediate alerts**

- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**

- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events;

**Harden infrastructure**

- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[12]

56. Given that Defendants maintained or controlled the Private Information of Plaintiff and Class Members within their respective roles, each Defendant could and should have implemented the above measures applicable to its role, systems, and oversight responsibilities.

57. The occurrence of the Data Breach indicates that Defendants failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting

---

[12] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at:* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/

in the Data Breach and data thieves acquiring and accessing the Private Information of, upon information and belief, thousands to tens of thousands of individuals, including that of Plaintiff and Class Members.

### *D. Plaintiff's Experience*

58. Plaintiff Terri Fink was a patient of MSBI prior to the Data Breach.

59. As a condition of obtaining medical treatment services from MSBI, she was required to provide her Private Information to MSBI, including her name, contact information, date of birth, Social Security number, health insurance information, payment/financial account information, medical history information, and other Private Information.

60. The specific combination of her name, date of birth, Social Security number, and medical diagnosis and treatment information compromised in the Data Breach creates a materially greater risk of identity theft and financial fraud than a data breach limited to non-sensitive contact information alone, because that combination is sufficient by itself to allow a bad actor to open new financial accounts, apply for credit, or file a fraudulent tax return in Plaintiff's name without independently obtaining any additional information about Plaintiff from any other source. To the extent the Data Breach exposed immutable identifiers such as a Social Security number or date of birth, that risk is further heightened because, unlike a password or account number, such identifiers cannot be changed or replaced.

61. At the time of the Data Breach, on or around November 2024, Plaintiff's Private Information was maintained or processed on 3c Care's systems for MSBI.

62. Plaintiff is very careful about sharing her sensitive Private Information. She stores any documents containing her Private Information in a safe and secure location. She has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. She would not have entrusted her Private Information to MSBI had she known of Defendants' lax data security policies.

63. Plaintiff received the Notice Letter, by U.S. mail, directly from MSBI, dated August 14, 2026. According to the Notice Letter, Plaintiff's Private Information was improperly accessed and obtained by unauthorized third parties.

64. As a result of the Data Breach, and at the direction of Defendants' Notice Letter, Plaintiff made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach. She has spent significant time dealing with the Data Breach—valuable time she otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

65. At the instant Plaintiff's Private Information was accessed by cybercriminals without her consent or authorization, she suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of her Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) nominal damages; and (vii) the continued and certainly increased risk to her Private Information, which: (a) remains unencrypted and available for unauthorized third parties

to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information.

66. Plaintiff is at an increased risk of unwanted calls, texts, and/or emails following the Data Breach. Criminals routinely target data breach victims with unsolicited and deceptive communications designed to gain access to victims' devices, elicit additional personal information, or facilitate identity theft and fraud. This risk is made possible by cybercriminals' ability to leverage compromised data -- such as the names, Social Security numbers, dates of birth, payment card numbers, and medical information exposed in this Data Breach -- to locate additional identifying information about individuals, including phone numbers and email addresses, through publicly available sources and data aggregation websites that associate personal information with specific individuals. Plaintiff therefore faces a heightened and concrete risk of such communications as a direct and proximate result of the Data Breach.

67. The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not fully informed her of key details about the Data Breach's occurrence.

68. Plaintiff's Private Information, exfiltrated in the Data Breach, is currently available on the dark web, exposing Plaintiff to actual, present harm.

69. As a result of the Data Breach, Plaintiff has already spent time and incurred out of pocket costs and anticipates spending in the future considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

70. As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for her lifetime.

71. Plaintiff has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

72. Defendants' conduct resulted in the unauthorized disclosure of Plaintiff's private information to cybercriminals. The unauthorized disclosure of Plaintiff's Private Information constitutes an invasion of a legally protected privacy interest that is traceable to 3c Care's alleged failure to secure its systems and MSBI's alleged failure to exercise reasonable vendor oversight, and has resulted in actual, particularized, and concrete harm to the Plaintiff. The injuries Plaintiff suffered, as described herein, can be redressed by a favorable decision in this matter.

73. Defendants' conduct, as evidenced by the circumstances of the Data Breach, has resulted in Plaintiff's actual fraud and creates an imminent risk of future identity theft, fraud, or other forms of exploitation.

74. More specifically, the exposure to the Data Breach caused Plaintiff to: (i) spend money on mitigation measures like credit monitoring services and/or dark web searches; (ii) lose time and effort spent responding to the Data Breach; and/or (iii) experience emotional distress associated with reviewing accounts for fraud, changing usernames and passwords or closing accounts to prevent fraud, and general anxiety over the consequences of the Data Breach.

75. Plaintiff's mitigation measures were not a self-inflicted harm, as these actions

were taken after the data breach occurred but before Defendants provided her with any explanation of the Data Breach, which has not happened to date as described herein.

76. Plaintiff has a continuing interest in ensuring that her personal information is kept confidential and protected from disclosure, and she should be entitled to injunctive and other equitable relief.

### *E. The Data Breach Was Foreseeable: Defendants Knew, or Should Have Known, of the Risk Because Healthcare Entities in Possession of Private Information are Particularly Susceptible to Cyber Attacks*

77. Defendants knew or should have known of the risk of a data breach, especially because healthcare entities in possession of Private Information are particularly susceptible to cyber attacks.

78. Defendants' data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting healthcare entities that collect and store Private Information, like Defendants, preceding the date of the breach.

79. Data breaches, including those perpetrated against healthcare entities that store Private Information in their systems, have become widespread.

80. In 2025, a new all-time high for data compromises occurred, with 3,322 compromises reported.[13] Of the 3,322 recorded data compromises, 534 of them, or

[13] *See* Identity Theft Resource Center, *2025 Annual Data Breach Report* (January 29, 2026), *available at* https://www.idtheftcenter.org/publication/2025-data-breach-report/ (last visited August 11, 2026).

approximately 16%, were in the medical or healthcare industry.[14] The 3,322 compromises resulted in approximately 278.8 million victim notices nationwide.[15]

81. In light of recent high profile cybersecurity incidents at other healthcare partner and provider companies, including HCA Healthcare (11 million patients, July 2023), Managed Care of North America (8 million patients, March 2023), PharMerica Corporation (5 million patients, March 2023), HealthEC LLC (4 million patients, July 2023), ESO Solutions, Inc. (2.7 million patients, September 2023), Prospect Medical Holdings, Inc. (1.3 million patients, July-August 2023),[16] Defendants knew or should have known that their electronic records would be targeted by cybercriminals.

82. Indeed, cyber-attacks, such as the one experienced by Defendants, have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack. As one report explained, smaller entities that store Private Information are "attractive to ransomware criminals…because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[17]

---

[14] *Id*.
[15] *Id*.
[16] https://www.hipaajournal.com/security-breaches-in-healthcare/
[17] https://www.law360.com/patientprotection/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware?nl_pk=3ed44a08-fcc2-4b6c-89f0 aa0155a8bb51&utm_source=newsletter&utm_medium=email&utm_campaign=patientprotection

83. Additionally, as companies became more dependent on computer systems to run their business,[18] *e.g.*, working remotely as a result of the Covid-19 pandemic, and the Internet of Things ("IoT"), the danger posed by cybercriminals is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.[19]

84. Defendants knew and understood unprotected or exposed Private Information in the custody of healthcare companies, like Defendants, is valuable and highly sought after by nefarious third parties seeking to illegally monetize that Private Information through unauthorized access.

85. At all relevant times, Defendants knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiff and Class Members and of the foreseeable consequences that would occur if Defendants' data security systems were breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

86. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

---

[18]https://www.federalreserve.gov/econres/notes/feds-notes/implications-of-cyber-risk-for-financial-stability-20220512.html
[19] https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022

87. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

88. The ramifications of Defendants' failure to keep secure the Private Information of Plaintiff and Class Members are long lasting and severe. Once Private Information is stolen—particularly Social Security numbers and PHI—fraudulent use of that information and damage to victims may continue for years.

89. As a healthcare entity in custody of the Private Information of its patients, Defendants knew, or should have known, the importance of safeguarding Private Information entrusted to it by Plaintiff and Class Members, and of the foreseeable consequences if its data security systems were breached. This includes the significant costs imposed on Plaintiff and Class Members as a result of a breach. Defendants failed, however, to take adequate cybersecurity measures to prevent the Data Breach.

### *F. Value of Private Information*

90. Federal regulations define identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[20] Those regulations describe "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government

[20] 17 C.F.R. § 248.201 (2013).

issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[21]

91. The PII and PHI of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[22]

92. For example, Personal Information can be sold at a price ranging from $40 to $200.[23] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[24]

93. Of course, a stolen Social Security number – standing alone – can be used to wreak untold havoc upon a victim's personal and financial life. The popular person privacy and credit monitoring service LifeLock by Norton notes "Five Malicious Ways a Thief Can Use Your Social Security Number," including 1) Financial Identity Theft that includes "false applications for loans, credit cards or bank accounts in your name or withdraw money from your accounts, and which can encompass credit card fraud, bank fraud, computer fraud, wire fraud, mail fraud and employment fraud; 2) Government Identity Theft, including tax refund fraud; 3) Criminal Identity Theft, which involves using

---

[21] *Id.*

[22] *Your personal data is for sale on the dark web. Here's how much it costs*, Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/

[23] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/

[24] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/

someone's stolen Social Security number as a "get out of jail free card;" 4) Medical Identity Theft, and 5) Utility Fraud.

94. It is little wonder that courts have dubbed a stolen Social Security number as the "gold standard" for identity theft and fraud. Social Security numbers are among the worst kind of Private Information to have been stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change.

95. The greater efficiency of electronic health records brings the risk of privacy breaches. These electronic health records contain a lot of sensitive information (*e.g.,* patient data, patient diagnosis, lab results, medications, prescriptions, treatment plans, etc.) that is valuable to cybercriminals. One patient's complete record can be sold for hundreds of dollars on the dark web. As such, PHI/PII is a valuable commodity for which a "cyber black market" exists where criminals openly post stolen payment card numbers, Social Security numbers, and other personal information on several underground internet websites. Unsurprisingly, the healthcare industry is at high risk and is acutely affected by cyberattacks, like the Data Breach here.

96. Between 2005 and 2019, at least 249 million people were affected by healthcare data breaches.[25] Indeed, during 2019 alone, over 41 million healthcare records were exposed, stolen, or unlawfully disclosed in 505 data breaches.[26] In short, these sorts of data breaches are increasingly common, especially among healthcare systems, which account

[25] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7349636/#B5-healthcare-08-00133/ (last accessed February 11, 2026).
[26] https://www.hipaajournal.com/december-2019-healthcare-data-breach-report/ (last accessed February 11, 2026).

for 30.03 percent of overall health data breaches, according to cybersecurity firm Tenable.[27]

97. According to account monitoring company LogDog, coveted Social Security numbers were selling on the dark web for just $1 in 2016—the same as a Facebook account. That pales in comparison with the asking price for medical data, which was selling for $300 and up.[28] Sensitive Private Information can sell for as much as $363 per record according to the Infosec Institute.[29]

98. Healthcare data is especially prized by data thieves. The National Association of Healthcare Access Management reports, "[p]ersonal medical data is said to be more than ten times as valuable as credit card information."[30]

99. "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they

---

[27] https://www.tenable.com/blog/healthcare-security-ransomware-plays-a-prominent-role-incovid-19-era-breaches/ (last accessed February 11, 2026).

[28] Paul Ducklin, *FBI "ransomware warning" for healthcare is a warning for everyone!*, Sophos (Oct. 29, 2020) *available at* https://news.sophos.com/en-us/2020/10/29/fbi-ransomware-warning-for-healthcare-is-a-warning-for-everyone/ (last visited February 11, 2026).

[29] Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), *available at* https://www.infosecinstitute.com/resources/healthcare-information-security/hackers-selling-healthcare-data-in-the-black-market/ (last visited February 11, 2026).

[30] Laurie Zabel, *The Value of Personal Medical Information: Protecting Against Data Breaches*, NAHAM Connections, *available at* https://www.naham.org/page/ConnectionsThe-Value-of-Personal-Medical-Information (last visited February 11, 2026).

frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[31]

100. A study by Experian found that the average cost of medical identity theft is "about $20,000" per incident and that most victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive to restore coverage.[32] Almost half of medical identity theft victims lose their healthcare coverage as a result of the incident, while nearly one-third of medical identity theft victims saw their insurance premiums rise, and 40 percent were never able to resolve their identity theft at all.[33]

101. Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—Social Security numbers and names.

102. In recent years, the medical and financial services industries have experienced disproportionally higher numbers of data theft events than other industries. Defendants therefore knew or should have known this and strengthened their data systems accordingly.

---

[31] Michael Ollove, "The Rise of Medical Identity Theft in Healthcare," Kaiser Health News, Feb. 7, 2014, https://khn.org/news/rise-of-indentity-theft/ (last accessed February 11, 2026).

[32] *See* Elinor Mills, "Study: Medical Identity Theft is Costly for Victims," CNET (Mar, 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/ (last accessed February 11, 2026).

[33] *Id.; see also Healthcare Data Breach: What to Know About them and What to Do After One,* EXPERIAN, https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/ (last accessed February 11, 2026).

Defendants were put on notice of the substantial and foreseeable risk of harm from a data breach, yet they failed to properly prepare for that risk.

103. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

***G. Defendants Failed to Comply with FTC Guidelines***

104. The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the FTCA, 15 U.S.C. § 45. *See, e.g.*, *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

105. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal patient information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and

implement policies to correct any security problems.[34] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor incoming traffic for activity suggesting someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[35]

106. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

107. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect patient data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions also clarify the measures businesses must take to meet their data security obligations.

108. These FTC enforcement actions include actions against healthcare providers like Defendants. *See, e.g., In the Matter of LabMD, Inc., A Corp*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (F.T.C. July 28, 2016) ("[T]he Commission

---

[34] Federal Trade Commission, *Protecting Personal Information: A Guide for Business* (2016), *available at* www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited February 11, 2026).
[35] *Id*.

concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

109. As evidenced by the Data Breach, Defendants failed to properly implement basic data security practices and failed to audit, monitor, or ensure the integrity of its data security practices, or to appropriately prepare to face a data breach and respond to it in a timely manner.

110. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to patients' PII and PHI constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

111. Defendants were always fully aware of their obligation to protect the PII and PHI of their patients. Defendants were also aware of the significant repercussions that would result from their failure to do so.

112. Accordingly, Defendants' conduct was particularly unreasonable given the nature and amount of PII and PHI they obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

### *H. Defendants Failed to Comply with HIPAA Guidelines*

113. MSBI is a covered entity under HIPAA (45 C.F.R. § 160.102) and is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

114. 3c Care, as a vendor that creates, receives, maintains, or transmits protected health information on MSBI's behalf, is a "business associate" within the meaning of HIPAA. 45 C.F.R. § 160.103. Pursuant to the Health Information Technology for Economic and Clinical Health Act ("HITECH"), business associates are directly subject to, and civilly and criminally liable for violations of, the applicable administrative, physical, and technical safeguard requirements of the HIPAA Security Rule to the same extent as covered entities. 42 U.S.C. § 17931(a); 45 C.F.R. §§ 164.308, 164.310, 164.312, 164.316. 3c Care was further required to enter into, and to abide by the terms of, a written business associate agreement with MSBI obligating 3c Care to appropriately safeguard protected health information and to report security incidents to MSBI. 45 C.F.R. §§ 164.502(e), 164.504(e), 164.314(a).

115. Defendants are each subject to rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH").[36] *See* 42 U.S.C. §17921, 45 C.F.R. § 160.103.

116. HIPAA's Privacy Rule or *Standards for Privacy of Individually Identifiable Health Information* establishes national standards for the protection of health information.

117. HIPAA's Privacy Rule or *Security Standards for the Protection of Electronic Protected Health Information* establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

---

[36] HIPAA and HITECH work in tandem to provide guidelines and rules for maintaining protected health information. HITECH references and incorporates HIPAA.

118. HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

119. "Electronic protected health information" is "individually identifiable health information … that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

120. HIPAA's Security Rule requires Defendants to do the following:

a. Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

b. Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

c. Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

d. Ensure compliance by its workforce.

121. HIPAA also requires each Defendant to "review and modify the security measures implemented … as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, each Defendant is required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

122. HIPAA and HITECH also obligated each Defendant to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against

uses or disclosures of electronic protected health information that are reasonably anticipated but not permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); *see also* 42 U.S.C. §17902.

123. The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, required MSBI, as the covered entity, to provide notice of the Data Breach to each affected individual "without unreasonable delay and ***in no case later than 60 days following discovery of the breach***."[37] The Rule likewise required 3c Care, as MSBI's business associate, to notify MSBI of the Data Breach without unreasonable delay. 45 C.F.R. § 164.410.

124. HIPAA requires a covered entity such as MSBI to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. *See* 45 C.F.R. § 164.530(e).

125. HIPAA requires a covered entity such as MSBI to mitigate, to the extent practicable, any harmful effect that is known to it of a use or disclosure of protected health information in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by MSBI or its business associate, 3c Care. *See* 45 C.F.R. § 164.530(f).

126. HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents

[37] Breach Notification Rule, U.S. Dep't of Health & Human Services, https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html (emphasis added).

on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule." US Department of Health & Human Services, Security Rule Guidance Material.[38] The list of resources includes a link to guidelines set by the National Institute of Standards and Technology (NIST), which OCR says, "represent the industry standard for good business practices with respect to standards for securing e-PHI." US Department of Health & Human Services, Guidance on Risk Analysis.[39]

### *I. Defendants Failed to Comply with Industry Standards*

127. As shown above, experts studying cyber security routinely identify healthcare providers as being particularly vulnerable to cyberattacks because of the value of the PII and PHI which they collect and maintain.

128. Several best practices have been identified that a minimum should be implemented by healthcare providers like Defendants, including, but not limited to, educating all employees; using strong passwords; creating multi-layer security, including firewalls, antivirus, and anti-malware software; encryption, making data unreadable

[38] http://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html.
[39] https://www.hhs.gov/hipaa/for-professionals/security/guidance/guidance-risk-analysis/index.html

without a key; using multi-factor authentication; protecting backup data; and limiting which employees can access sensitive data.

129. Other best cybersecurity practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

130. Moreover, a properly trained helpdesk that understands how to face social engineering attacks is an expected part of all cybersecurity programs.

131. As evidenced by the Data Breach and its timeline, Defendants failed to follow some or all these industry best practices.

132. Defendants failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

133. These foregoing frameworks are existing and applicable industry standards in the healthcare industry, and Defendants failed to comply with these accepted standards, thereby opening the door to and causing the Data Breach.

### *J. The Data Breach Caused Plaintiff and the Class Members Injury and Damages*

134. Independent of any risk of future harm, Plaintiff and the Class Members have already sustained concrete, present harm as a direct result of the Data Breach, including but not limited to: (a) time spent responding to the Data Breach, including reviewing account statements, credit reports, and correspondence concerning the Data Breach; (b) out-of-pocket expenses incurred for credit monitoring, credit freezes, fraud alerts, or other protective measures; and (c) the exposure of, and continued unauthorized third-party possession of, their Private Information, which has already occurred and is not a matter of future risk. These already-incurred harms are alleged separately from, and independently of, the increased risk of future identity theft and fraud alleged in the section below.

135. Plaintiff and members of the proposed Class have suffered injury and damages from the unauthorized disclosure and misuse of their Private Information disclosed in the Data Breach that can be directly traced to Defendants, that has occurred, is ongoing, and/or will imminently occur.

136. Data Breaches such as the one experienced by Defendants' patients are especially problematic because of the disruption they cause to the daily lives of victims affected by the attack.

137. As stated prior, on information and belief, in the Data Breach, cybercriminals were able to access the Plaintiff's and the proposed Class Members' Private Information, which is now being used or will imminently be used for fraudulent purposes and/or has been sold for such purposes and posted on the Dark Web for sale, causing widespread injury and damages.

138. Once an individual's Private Information is for sale and access on the dark web, cybercriminals are able to use the stolen and compromised data to gather and steal even more information.[40]

139. The ramifications of Defendants' failure to keep Plaintiff's and the Class's Private Information secure are severe. Identity theft occurs when someone uses another's personal and financial information such as that person's name, account number, Social Security number, driver's license number, date of birth, or other information, such as addresses, without permission, to commit fraud or other crimes.

140. Because Defendants failed to prevent the Data Breach, Plaintiff and the proposed Class Members have suffered, will imminently suffer, and will continue to suffer injury-in-fact and damages, including but not limited to:

a. The loss of the opportunity to control how Private Information is used;

b. Unauthorized use of stolen Private Information;

c. Dramatic increase in spam telephone calls;

d. Emotional distress;

e. The compromise and continuing publication of their Private Information;

f. Out-of-pocket expenses associated with the prevention, detection, recovery, and remediation from identity theft or fraud, and for necessary credit monitoring and identity theft protection;

[40] Ryan Toohil, *What do Hackers do with Stolen Information*, Aura, (September 5, 2023) https://www.aura.com/learn/what-do-hackers-do-with-stolen-information (last visited February 11, 2026).

g. Lost opportunity costs and lost wages associated with the time and effort expended addressing and trying to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

h. The diminution in value of their Private Information;

i. Delay in receipt of tax refund monies; and,

j. The continued risk to their PII and PHI, which remains in the possession of Defendants and is subject to further breaches so long as Defendants fail to undertake the appropriate measures to protect the PII and PHI in their possession.

### *K. The Data Breach Caused Plaintiff and the Class Members Increased Risk of Identity Theft*

141. Furthermore, the Data Breach has placed Plaintiff and the proposed Class Members at an increased risk of fraud and identity theft.

142. Plaintiff and Class Members are at a heightened risk of identity theft for years to come, especially because Defendants' failures resulted in Plaintiff's and Class Members' PII and PHI falling into the hands of identity thieves.

143. The unencrypted PII and PHI of Class Members has already or will end up for sale on the dark web because that is the *modus operandi* of hackers. Indeed, when these criminals do not post the data to the dark web, it is usually at least sold on private Telegram channels to even further identity thieves who purchase the PII for the express purpose of conducting financial fraud and identity theft operations.

144. Further, the standard operating procedure for cybercriminals is to use some data, like the PII here, to access "Fullz packages" of that person to gain access to the full suite of additional PII that those cybercriminals have access through other means. Using

this technique, identity thieves piece together full pictures of victim's information to perpetrate even more types of attacks.

145. With "Fullz" packages, cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals.

146. The development of "Fullz" packages means here that the stolen PII from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

147. There are myriad dangers which affect victims of identity theft, including: cybercriminals opening new financial accounts, credit cards, and loans in victim's names; victim's losing health care benefits (medical identity theft); hackers taking over email and other accounts; time and effort to repair credit scores; losing home due to mortgage and deed fraud; theft of tax refunds; hackers posting embarrassing posts on victim's social media accounts; victims spending large amounts of time and money to recover their identities; experiencing psychological harm and emotional distress; victims becoming further victimized by repeat instances of identity theft and fraud; cybercriminals committing crimes in victim's names; victims' personal data circulating the Dark Web

forever; victims receiving increased spam telephone calls and emails; victims' children or elderly parents having their identities stolen.

148. The FTC recommends that identity theft victims take several costly steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, seeking a credit freeze, and correcting their credit reports.[41]

149. Identity thieves use stolen PII such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

150. According to the Social Security Administration, each time an individual's Social Security number is compromised, "the potential for a thief to illegitimately gain access to bank accounts, credit cards, driving records, tax and employment histories and other private information increases." [42] Moreover, "[b]ecause many organizations still use SSNs as the primary identifier, exposure to identity theft and fraud remains."[43]

---

[41] Federal Trade Commission, *What To Do Right Away* (2024), *available at* https://www.identitytheft.gov/Steps (last visited February 11, 2026).

[42] *See* https://www.ssa.gov/phila/ProtectingSSNs.htm#:~:text=An%20organization's%20collection%20and%20use,and%20other%20private%20information%20increases.

[43] *Id.*

151. The Social Security Administration stresses that the loss of an individual's Social Security number, as experienced by Plaintiff and some Class Members, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[44]

152. In fact, "[a] stolen Social Security number is one of the leading causes of identity theft and can threaten your financial health."[45] "Someone who has your SSN can use it to impersonate you, obtain credit and open bank accounts, apply for jobs, steal your tax refunds, get medical treatment, and steal your government benefits."[46]

153. Identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's PII to police during an arrest—resulting in an arrest warrant being issued in the victim's name. That can be even more problematic and difficult to remedy for someone who already has a criminal record.

154. Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security numbers also make it possible for thieves to file

---

[44] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf

[45] *See* https://www.equifax.com/personal/education/identity-theft/articles/-/learn/social-security-number-identity-theft/

[46] *See* https://www.investopedia.com/terms/s/ssn.asp

fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity. Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

155. It is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

156. Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[47]

157. The California state government warns patients that: "[o]riginally, your Social Security number (SSN) was a way for the government to track your earnings and pay you retirement benefits. But over the years, it has become much more than that. It is the key to

[47] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft

a lot of your personal information. With your name and SSN, an identity thief could open new credit and bank accounts, rent an apartment, or even get a job."[48]

158. Theft of PHI is also gravely serious: "A thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[49] Drug manufacturers, medical device manufacturers, pharmacies, hospitals and other healthcare service providers often purchase PII/PHI on the black market for the purpose of target marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongfully disclosed PHI to adjust their insureds' medical insurance premiums.

159. Further, the Identity Theft Resource Center's 2021 Consumer Aftermath Report documents serious financial and emotional consequences among surveyed identity-crime victims. Twenty-nine percent of surveyed victims had previously experienced another identity crime, and 10% of pre-pandemic respondents reported suicidal feelings—the highest level recorded by the ITRC since 2003. Among respondents affected by pandemic-related identity fraud, 33% lacked sufficient money for food or utilities, 14% were evicted

[48] *See* https://oag.ca.gov/idtheft/facts/your-ssn

[49] *See* Federal Trade Commission, *Medical Identity Theft, available at* http://www.consumer.ftc.gov/articles/0171-medical-identity-theft (last visited February 11, 2026).

for nonpayment of rent or mortgage, and 54% felt violated because their identities had been misused.[50]

160. What's more, theft of PII and PHI is also gravely serious outside of the traditional risks of identity theft. In the last two decades, as more and more of our lives become interconnected through the lens of massively complex cloud computing, PII and PHI are valuable property rights.

161. PII and PHI are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

162. Where the most PII and PHI belonging to Plaintiff and Class Members was accessible from Defendants' network, there is a strong probability that entire batches of stolen information have been dumped on the black market and are yet to be dumped on the black market, meaning Plaintiff and the Class Members are at an increased risk of fraud and identity theft for many years into the future.

163. Further, there may be a substantial time lag—measured in years—between when harm occurs versus when it is discovered, and between when Private Information

---

[50] Identity Theft Resource Center, 2021 Consumer Aftermath Report: How Identity Crimes Impact Victims, Their Families, Friends, and Workplaces (May 2021), https://www.idtheftcenter.org/wp-content/uploads/2021/09/ITRC_2021_Consumer_Aftermath_Report.pdf (last visited July 30, 2026).

and/or financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which studied data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.
>
> *See* GAO Report, at p. 29.

164. Thus, Plaintiff and the Class Members must vigilantly monitor their financial and credit accounts for many years to come.

165. Accordingly, the Data Breach has caused Plaintiff and the proposed Class Members a greatly increased risk of identity theft and fraud, in addition to the other injuries and damages set forth herein.

166. Defendants knew or should have known of these harms which would be caused by the Data Breach it permitted to occur and strengthened its data systems accordingly.

### *L. Loss of Time to Mitigate Risk of Identity Theft and Fraud*

167. Because of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that his or her Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm and a Defendant arguing that the individual failed to mitigate damages.

168. The need to spend time mitigating the risk of harm is especially important in cases like this where Plaintiff's and Class Members' Social Security numbers or other government identification are affected.

169. By spending this time, Plaintiff was not manufacturing her own harm, she was taking necessary steps at Defendants' direction.

170. Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions to remedy the harms they have or may experience because of the Data Breach, such as contacting credit bureaus to place freezes on their accounts; changing passwords and re-securing their own computer networks; and checking their financial accounts for any indication of fraudulent activity, which may take years to detect.

171. These efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to his good name and credit record."[51]

[51] See U.S. Gov't Office, GAO-07-737, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* (June 2007), https://www.gao.gov/products/gao-07-737

### *M. Diminution in Value of Private Information*

172. PII and PHI are valuable property rights.[52] Their value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

173. An active and robust legitimate marketplace for Private Information exists. In 2019, the data brokering industry was worth roughly $200 billion.[53]

174. In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[54]

175. Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[55]

---

[52] *See, e.g.*, John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("Private Information") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("Private Information, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).
[53] https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited February 11, 2026).
[54] https://datacoup.com/ (last visited February 11, 2026).
[55] Nielsen Computer & Mobile Panel, Frequently Asked Questions, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited February 11, 2026).

176. Conversely sensitive PII can sell for as much as $363 per record on the dark web according to the Infosec Institute.[56]

177. As a result of the Data Breach, Plaintiffs' and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, Private Information is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

### *N. The Future Cost of Credit and Identity Theft Monitoring Is Reasonable and Necessary*

178. Based on the value of the information stolen, the data either has or will be sold to cybercriminals whose mission it is to perpetrate identity theft and fraud. Even if the data is not posted online, these data are ordinarily sold and transferred through private Telegram channels wherein thousands of cybercriminals participate in a market for such data so that they can misuse it and earn money from financial fraud and identity theft of data breach victims.

[56] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://www.infosecinstitute.com/resources/healthcare-information-security/hackers-selling-healthcare-data-in-the-black-market/ (last visited February 11, 2026).

179. Such fraud may go undetected for years; consequently, Plaintiff and Class Members are at a present and continuous risk of fraud and identity theft for many years into the future.

180. The retail cost of credit monitoring and identity theft monitoring can cost $200 or more per year per Class Member. This is a reasonable and necessary cost to monitor and protect Class Members from the risk of identity theft that arose from the Data Breach. This is a future cost for a minimum of ten years that Plaintiff and Class Members would not need to bear but for Defendants' failure to safeguard their Private Information.

## V. DEFENDANTS' BREACH

181. Defendants breached their obligations to Plaintiff and Class Members and/or were otherwise negligent and reckless because they failed to maintain and safeguard the systems, information, and vendor relationships within their respective control. Defendants' unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a. Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b. Failing to adequately protect patients' Private Information;

c. Failing to properly monitor its own data security systems for existing intrusions;

d. Failing by MSBI to exercise reasonable care in selecting and overseeing 3c Care as its vendor with access to protected health data;

e. Failing by 3c Care to ensure the confidentiality and integrity of electronic PHI it created, received, maintained, and/or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

f. Failing by 3c Care to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

g. Failing by 3c Care to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1)(i);

h. Failing by 3c Care to implement procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

i. Failing by 3c Care to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

j. Failing by 3c Care to protect against reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules related to individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

k. Failing by each Defendant to ensure compliance with HIPAA security standard rules by its own workforce in violation of 45 C.F.R. § 164.306(a)(4);

l. Failing by each Defendant to train all members of its workforce effectively on the policies and procedures about PHI as necessary and appropriate for the members of its workforce to carry out their functions and to maintain security of PHI, in violation of 45 C.F.R. § 164.530(b); and/or

m. Failing by 3c Care to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals, as it had not encrypted the electronic PHI as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key" (45 C.F.R. § 164.304, definition of "encryption").

182. As the result of computer systems needing security upgrading, inadequate vetting and oversight of vendors, inadequate procedures for handling emails containing malignant computer code, and inadequately trained employees who opened files containing

malignant computer code, Defendants negligently and unlawfully failed to safeguard Plaintiff's and Class Members' Private Information.

183. Plaintiff and Class Members now face an increased risk of fraud and identity theft.

## VI. PLAINTIFF'S AND CLASS MEMBERS' DAMAGES

184. To date, Defendants have done little to provide Plaintiff and Class Members with relief for the damages they have suffered because of the Data Breach, including, but not limited to, the costs and loss of time they incurred because of the Data Breach. MSBI has only offered 12 months of inadequate credit monitoring services, despite Plaintiff and Class Members being at risk of identity theft and fraud for the remainder of their lifetimes.

185. Defendants have wholly failed to compensate Plaintiff and Class Members, which is inadequate given that victims commonly face multiple years of ongoing identity theft, and they provide no compensation for their unauthorized release and disclosure of Plaintiff's and Class Members' Private Information. The 12 months of credit monitoring offered to persons whose Private Information was compromised is wholly inadequate as it fails to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft and financial fraud.

186. Defendants' credit monitoring advice to Plaintiff and Class Members places the burden on Plaintiff and Class Members, rather than on Defendants, to investigate and protect themselves from Defendants' tortious acts resulting in the Data Breach. Rather than automatically enrolling Plaintiff and Class Members in credit monitoring services upon

discovery of the breach, Defendants merely sent instructions to Plaintiff and Class Members about actions they can affirmatively take to protect themselves.

187. Plaintiff and Class Members have been damaged by the compromise and exfiltration of their Private Information in the Data Breach, and by the severe disruption to their lives as a direct and foreseeable consequence of this Data Breach.

188. Plaintiff's Private Information was compromised and exfiltrated by cyber-criminals as a direct and proximate result of the Data Breach.

189. Plaintiff was damaged in that her Private Information is in the hands of cyber criminals.

190. As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have been placed at an actual, present, immediate, and continuing increased risk of harm from fraud and identity theft.

191. As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have been forced to expend time dealing with the effects of the Data Breach.

192. Plaintiff and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, and similar identity theft.

193. Plaintiff and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Private Information as potential fraudsters could use that information to more effectively target such schemes to Plaintiff and Class Members.

194. Plaintiff and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

195. Plaintiff and Class Members also suffered a loss of value of their Private Information when it was acquired by cyber thieves in the Data Breach. Many courts have recognized the propriety of loss of value damages in related cases.

196. Plaintiff and Class Members have spent and will continue to spend significant amounts of time to monitor their financial accounts and records for misuse.

197. Plaintiff and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

a. Finding fraudulent charges;
b. Canceling and reissuing credit and debit cards;
c. Purchasing credit monitoring and identity theft prevention;
d. Addressing their inability to withdraw funds linked to compromised accounts;
e. Taking trips to banks and waiting in line to obtain funds held in limited accounts;
f. Placing "freezes" and "alerts" with credit reporting agencies;
g. Spending time on the phone with or at a financial institution to dispute fraudulent charges;
h. Contacting financial institutions and closing or modifying financial accounts;
i. Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;
j. Paying late fees and declined payment fees imposed because of failed automatic payments that were tied to compromised cards that had to be cancelled; and
k. Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

198. Moreover, Plaintiff and Class Members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendants, is

protected from further breaches by implementing security measures and safeguards, including, but not limited to, making sure that the storage of data or documents containing personal and financial information is inaccessible online and that access to such data is password protected.

199. Further, because of Defendants' conduct, Plaintiff and Class Members are forced to live with the anxiety that their Private Information —which contains the most intimate details about a person's life—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

200. As a direct and proximate result of Defendants' actions and inactions, Plaintiff and Class Members have suffered anxiety, emotional distress, and loss of privacy, and are at an increased risk of future harm.

## VII. CLASS ACTION ALLEGATIONS

201. This action is brought and may be properly maintained as a class action pursuant to Fed. R. Civ. P. 23.

202. Plaintiff brings this action on behalf of herself and on behalf of all other persons similarly situated.

203. Plaintiff proposes the following Class definition, subject to amendment as appropriate:

> **All persons whose Private Information was compromised because of the Data Breach identified in November 2024 (the "Class").**

204. Excluded from the Class are Defendants' officers and directors, and any entity in which either Defendant has a controlling interest; and the affiliates, legal representatives,

attorneys, successors, heirs, and assigns of Defendants. Excluded also from the Class are Members of the judiciary to whom this case is assigned, their families and Members of their staff.

205. Plaintiff reserves the right to amend or modify the class definitions with greater specificity or division after having an opportunity to conduct discovery.

206. Numerosity. The Members of the Class are so numerous that joinder of all of them is impracticable. The exact number and identities of Class Members are unknown to Plaintiff at this time, as such information is in the sole possession of Defendants and ascertainable through their records.

207. Commonality. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a. Whether Defendants unlawfully used, maintained, lost, or disclosed Plaintiff's and Class Members' Private Information;

b. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. Whether Defendants' data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d. Whether Defendants' data security systems prior to and during the Data Breach adhered to industry standards;

e. Whether Defendants owed a duty to Class Members to safeguard their Private Information;

f. Whether Defendants breached their respective duty to Class Members to safeguard their Private Information;

g. Whether Defendants knew or should have known that their data security systems and monitoring processes were deficient;

h. Whether Plaintiff and Class Members suffered legally cognizable damages from Defendants' misconduct;

i. Whether Defendants' conduct was negligent;

j. Whether Defendants' conduct was *per se* negligent;

k. Whether Defendants were unjustly enriched;

l. Whether Defendants failed to provide notice of the Data Breach promptly; and

m. Whether Plaintiff and Class Members are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

208. Typicality. Plaintiff's claims are typical of those of other Class Members because Plaintiff's Private Information, like that of every other Class member, was compromised in the Data Breach. Plaintiff's claims are typical of those of the other Class Members because, among other things, all Class Members were injured through the common misconduct of Defendants. Plaintiff is advancing the same claims and legal theories on behalf of herself and all other Class Members, and no defenses are unique to Plaintiff. Plaintiff's claims and those of Class Members arise from the same operative facts and are based on the same legal theories.

209. Adequacy of Representation. Plaintiff will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiff's Counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

210. Predominance. Defendants have engaged in a common course of conduct toward Plaintiff and Class Members, in that MSBI's patient data was maintained on the

same 3c Care systems and subjected to the same incident. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

211. Superiority. A Class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

212. Defendants have acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

213. Likewise, issues that will arise in this case are appropriate for class certification because such issues are common to the Class, the resolution of which would advance matter and the parties' interests therein. Such issues include, but are not limited to:

a. Whether Defendants failed to timely notify the public of the Data Breach;

b. Whether Defendants owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

c. Whether Defendants' security measures to protect their data systems were reasonable considering best practices recommended by data security experts;

d. Whether Defendants' failure to institute adequate protective security measures amounted to negligence;

e. Whether Defendants failed to take commercially reasonable steps to safeguard consumer Private Information; and

f. Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

214. Finally, all members of the proposed Class are readily ascertainable. 3c Care's records can identify the individuals whose Private Information was maintained on its systems for MSBI and determine whether that information was potentially compromised in the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by MSBI.

## VIII. CAUSES OF ACTION

### FIRST COUNT
### NEGLIGENCE
### (On Behalf of Plaintiff and All Class Members Against Both Defendants)

215. Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

216. MSBI required Plaintiff and Class Members to submit non-public personal information to obtain healthcare services. 3c Care accepted and maintained that information as MSBI's vendor.

217. By collecting, processing, storing, and using this data for commercial gain, each Defendant had a duty to use reasonable means within its role to secure and safeguard the systems and information under its control, to prevent disclosure of the information, and to safeguard the information from theft. Each Defendant's duty included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period and to give prompt notice to those affected in the case of a Data Breach.

218. 3c Care owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards for its systems and networks. MSBI owed a duty of care to exercise reasonable care in selecting and overseeing 3c Care and in ensuring that the vendor entrusted with patients' Private Information maintained adequate safeguards.

219. Defendants' duty of care to use reasonable security measures arose because of the special relationship created when Plaintiff and the Class entrusted MSBI with confidential Private Information as a necessary part of obtaining healthcare services from MSBI, and MSBI in turn entrusted that information to 3c Care for processing or storage. This special relationship is recognized by laws and regulations including, but not limited to, HIPAA, as well as common law. Defendants could ensure that their systems were sufficient to protect against the foreseeable risk of harm to Class Members from a data breach.

220. MSBI's duty to use reasonable security measures under HIPAA required MSBI to "reasonably protect" confidential data from "any intentional or unintentional use or

disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1). 3c Care was independently bound, as MSBI's business associate, by the HIPAA Security Rule's parallel administrative, physical, and technical safeguard requirements. 45 C.F.R. §§ 164.308, 164.310, 164.312. Some or all the healthcare information at issue constitutes "protected health information" within the meaning of HIPAA.

221. MSBI's duty to safeguard Private Information also arose from HIPAA's risk-analysis requirement, which is distinct from the general safeguards duty described in the preceding paragraph. As a HIPAA-regulated covered entity, MSBI was required to "conduct an accurate and thorough assessment of the potential risks and vulnerabilities to the confidentiality, integrity, and availability of electronic protected health information held by the covered entity or business associate." 45 C.F.R. § 164.308(a)(1)(ii)(A). 3c Care, as a business associate, was independently subject to this same risk-analysis requirement. This risk-analysis obligation required each Defendant to identify, before the Data Breach, the reasonably anticipated threats to the Private Information in its possession or control, independent of any industry-wide reporting. Compliance with this obligation would have made the risk of a data breach of this kind foreseeable to Defendants as a matter of their own regulatory record.

222. In addition, Defendants had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by

the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

223. Defendants' duty to use reasonable care in protecting confidential data arose not only because of the statutes and regulations described above, but also because Defendants are bound by industry standards to protect confidential Private Information.

224. Defendants breached their respective duties, and thus were negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b. Failing to adequately monitor the security of their networks and systems, and the effectiveness of relevant third-party safeguards;

c. Failing to periodically ensure that their email systems had plans in place to maintain reasonable data security safeguards;

d. Allowing unauthorized access to Class Members' Private Information;

e. Failing to detect timely that Class Members' Private Information had been compromised; and

f. Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

225. It was foreseeable that Defendants' failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the healthcare industry.

226. It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

227. Defendants' failure to comply with the statutory, regulatory, and common-law duties alleged above was not merely a general lapse in an abstract duty of care—it was a direct and proximate cause of the Data Breach itself. Had Defendants satisfied those duties, including by conducting the risk analyses those duties required, the vulnerability exploited to access 3c Care's systems would have been identified and remediated before the Data Breach occurred. Defendants' statutory and regulatory violations are accordingly the proximate cause of the Data Breach that produced Plaintiff's and Class Members' injuries, not merely background context for them.

228. Plaintiff and Class Members are entitled to compensatory and consequential damages suffered because of the Data Breach.

229. Defendants' negligent conduct is ongoing, in that they still hold the Private Information of Plaintiff and Class Members in an unsafe and unsecure manner.

230. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to (i) strengthen their data security systems and monitoring procedures within their respective control; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) provide adequate credit monitoring to all Class Members.

**SECOND COUNT**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and All Class Members Against MSBI)**

231. Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

232. When Plaintiff and Class Members provided their Private Information to MSBI in exchange for healthcare services from MSBI, they entered implied contracts with MSBI under which MSBI agreed to reasonably protect such information and to use reasonable care in selecting and overseeing any third-party vendor, including 3c Care.

233. MSBI solicited, offered, and invited Class Members to provide their Private Information as part of MSBI's regular business practices. Plaintiff and Class Members accepted MSBI's offers and provided their Private Information to MSBI.

234. In entering such implied contracts, Plaintiff and Class Members reasonably believed and expected that MSBI's data security and vendor-management practices complied with relevant laws and regulations, including HIPAA, and adhered to industry standards.

235. Plaintiff and Class Members paid money to MSBI with the reasonable belief and expectation that MSBI would use part of its earnings to obtain adequate data security. MSBI failed to do so.

236. Plaintiff and Class Members would not have entrusted their Private Information to MSBI in the absence of MSBI's implied promise to keep the information reasonably secure, including when it was placed with a third-party vendor such as 3c Care.

237. Plaintiff and Class Members would not have entrusted their Private Information to MSBI in the absence of MSBI's implied promise to monitor its own computer systems and networks, and to ensure that third-party vendors such as 3c Care adopted and maintained reasonable security measures.

238. Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with MSBI.

239. MSBI breached its implied contracts with Class Members by failing to safeguard and protect their Private Information and by failing to exercise reasonable care in selecting, monitoring, and overseeing 3c Care.

240. As a direct and proximate result of MSBI's breach of the implied contracts, Class Members sustained damages as alleged here, including the loss of the benefit of the bargain.

241. Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered because of the Data Breach.

242. Plaintiff and Class Members are also entitled to injunctive relief requiring MSBI to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

**THIRD COUNT**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and All Class Members Against Both Defendants)**

243. Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

244. Plaintiff brings this claim individually and on behalf of all Class Members. This count is pled in the alternative to the breach of contract count above.

245. Upon information and belief, each Defendant funds its data-security and vendor-management measures entirely from its general revenue, including payments made by or on behalf of Plaintiff and the Class Members.

246. As such, a portion of the payments made by or on behalf of Plaintiff and the Class Members is to be used to provide a reasonable level of data security, and the portion of each payment made that is allocated to data security is known to Defendants.

247. Plaintiff and Class Members conferred a monetary benefit on Defendants. They bought healthcare services from MSBI and in so doing provided their Private Information that MSBI and 3c Care accepted and used in providing their respective services. In exchange, Plaintiff and Class Members should have received from Defendants the services that were the subject of the transaction and had their Private Information protected with adequate data security.

248. Defendants knew that Plaintiff and Class Members conferred a benefit which Defendants accepted. Defendants profited from these transactions and used the Private Information of Plaintiff and Class Members for business purposes.

249. In the alternative to, and independent of, the revenue-allocation theory alleged in the preceding paragraphs, Defendants were separately unjustly enriched because each obtained and retained a financial benefit in the form of cost savings by failing to implement and maintain the data security or oversight measures reasonably necessary to protect Private Information of the kind entrusted to it. Defendants externalized the costs of those

failures onto Plaintiff and the Class Members, who have borne and will continue to bear the time, expense, and risk resulting from Defendants' decisions to retain, rather than expend, the resources reasonably necessary to secure their Private Information.

250. Defendants enriched themselves by saving the costs they reasonably should have expended on data-security and vendor-oversight measures to secure Plaintiff's and Class Members' Private Information. Rather than providing a reasonable level of security that would have prevented the Data Breach, Defendants instead calculated to increase their own profits at the expense of Plaintiff and Class Members by using cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' decisions to prioritize their own profits over the requisite security.

251. Under the principles of equity and good conscience, Defendants should not be permitted to retain the money belonging to Plaintiff and Class Members, because Defendants failed to implement appropriate data management and security measures that are mandated by industry standards.

252. Defendants failed to secure Plaintiff's and Class Members' Private Information and thus did not provide full compensation for the benefit Plaintiff and Class Members provided.

253. Defendants acquired the Private Information through inequitable means in that they failed to disclose the inadequate security practices alleged.

254. If Plaintiff and Class Members knew that Defendants had not reasonably secured their Private Information, they would not have agreed to provide their Private Information to Defendants.

255. Plaintiff and Class Members have no adequate remedy at law.

256. As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to:

a. actual identity theft;

b. the loss of the opportunity of how their Private Information is used;

c. the compromise, publication, and/or theft of their Private Information;

d. out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information;

e. lost opportunity costs associated with efforts expended and the loss of productivity addressing and attempting to mitigate the consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft;

f. the continued risk to their Private Information, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect Private Information in their continued possession; and

g. future costs in terms of time, effort, and money to be expended to prevent, detect, contest, and repair the effect of the Private Information compromised because of the Data Breach for the rest of the lives of Plaintiff and Class Members.

257. As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

258. Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them. In the alternative, Defendants should be compelled to refund the amounts that Plaintiff and Class Members overpaid for Defendants' services.

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the Class described above, seeks the following relief:

a. For an Order certifying this action as a class action, defining the Class as requested herein, appointing Plaintiff and her counsel to represent the Class, and finding that Plaintiff is a proper representative of the Class requested herein;

b. For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein relating to the misuse and/or disclosure of Plaintiff's and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

c. For equitable relief compelling Defendants to use appropriate methods and policies related to consumer data collection, storage, vendor management, and safety, and to disclose with specificity the type of Private Information compromised during the Data Breach;

d. For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained because of Defendants' wrongful conduct;

e. For an order directing Defendants to pay for not less than ten years of credit monitoring services for Plaintiff and the Class;

f. For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

g. For an award of punitive damages, as allowable by law;

h. For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

i. Pre- and post-judgment interest on any amounts awarded; and

j. Any other relief that this court may deem just and proper.

## X. JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.

DATED: August 25, 2026

Respectfully submitted,

*/s/ Philip J. Krzeski*
Philip J. Krzeski (#0403291)
**CHESTNUT CAMBRONNE PA**
100 Washington Ave S, Ste 1700
Minneapolis, MN 55401
Telephone: (612) 339-7300
Fax: (612) 336-2940
pkrzeski@chestnutcambronne.com

Leigh S. Montgomery*
lmontgomery@eksm.com
**ELLZEY KHERKHER SANFORD MONTGOMERY, LLP**
4200 Montrose Blvd, Ste 200
Houston, TX 77006
Telephone: (888) 350-3931
Fax: (888) 276-3455

**COUNSEL FOR PLAINTIFF AND THE PROPOSED CLASS**

(* denotes *pro hac vice* forthcoming)